IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JEROME CLINGER and TINA CLINGER, )<br>Husband and Wife, DARYL THOMPSON, )<br>GARTH THOMPSON, CHRIS )<br>THOMPSON, PAUL THOMPSON, KURT )<br>THOMPSON, JOHN THOMPSON, RON )<br>THOMPSON, F. CECIL TONER and )<br>KEVIN TONER, WINSTON INOUYE )<br>(dba I-2 Ranches), and INOUYE FARMS, )<br>INC., DON WRIGLEY, JAY WRIGLEY )<br>and GAYLE WRIGLEY, TRACEY FUNK )<br>and RON FUNK, ROLAND BEAN )<br>FARMS, BEAN FARMS, INC., DENISE )<br>BEAN, BRIAN BEAN and WAYNE )<br>BEAN, )<br> )<br>       Petitioners, )<br> )<br>   v. )<br> )<br>FARM SERVICE AGENCY, an Agency )<br>of The United States Department of )<br>Agriculture, )<br> )<br>       Respondent. )<br>_____) | Case No. CV-04-424-E-BLW<br><br>**MEMORANDUM<br>DECISION** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment.  The Court

heard oral argument on February 13, 2006, and the motions are now at issue.  For

the reasons expressed below, the Court will grant the Petitioners' motion and deny

**Memorandum Decision – Page 1**

the Government's motion.

## FACTS

Petitioners (hereinafter referred to as the farmers) include seven different farming families: Clingers, Thompsons, Beans, Toners, Wrigleys, Inouyes, and Funks.  When the Government demanded that these farmers return subsidy payments they received in return for destroying their sugar beet crops, the farmers brought this suit to block the Government's demands.

Both sides have filed motions for summary judgment.  The farmers seek, among other things, a ruling that the Government is estopped from recovering the subsidies, while the Government seeks to compel repayment.

In 2001, the United States Department of Agriculture (USDA) was storing over 700,000 tons of surplus sugar at a cost of about $1.35 million per month. *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 91-92 (D.C. Cir. 2002).  To reduce these inventories, the USDA promulgated the 2001 Payment-In-Kind (PIK) program.  Under the program, the USDA would use its stored sugar to satisfy farmers' delivery obligations to sugar processors.  In return, the farmers, having been relieved of their delivery obligations, would destroy their sugar beet crops.

On September 9, 2001, a USDA subsidiary, the Commodity Credit Corporation (CCC), announced the PIK Program in the Federal Register.  *See* 66

FR 47447.  To participate in the PIK Program, farmers had to meet the

requirements on Form CCC-744 and agree to its terms.  *See* 66 FR 47447(1).  The

farmer had to certify on Form CCC-744 that he was (1) a party to a grower contract

with a sugar processor, (2) entitled to share in the marketing of the sugar beets on

the grower contract, (3) authorized to divert (not make commercial use of) the

sugar beets on the contract acres, and (4) sharing the risk of producing the sugar

beets on the contract acres.

The announcement said that the program was to be administered by the

Executive Vice President of the CCC, but it delegated important functions to local

Farm Service Agency (FSA) offices.  *See* 66 FR 47447(1).   Those functions were

listed in Notice SU-70, issued September 9, 2001.  The Notice stated that the local

FSA offices would take responsibility for (1) notifying producers of the program

sign-up period, (2) determining land and producer eligibility, (3) assisting

producers with payment share determination, (4) processing offer information from

producers and complete Form CCC-744, and (5) submitting information to a

Kansas City office of the CCC.  *See* SU-70 at §§ 7F, 12B.

The PIK Program created a contractual relationship between the farmers and

the FSA/CCC through Form CCC-744 and its Appendix.  Farmers made a bid to

divert – essentially destroy –  a specified amount of their crop in return for sugar

from CCC storage.  *Sugar Cane*, 289 F.3d at 92.   The bid was the amount the farmers wanted in return for destroying a specified crop, and it was limited to $20,000.00 per year per farmer.  *See* 66 FR 47447; 7 U.S.C. § 1308a(e).

Farmers made their bids by filling out Form CCC-744.  The local FSA helped farmers fill out Form CCC-744 by counseling farmers on whether they were eligible producers, and on whether they could offer eligible lands. *See* SU-70, § 12B.

While the CCC was ultimately charged with accepting or rejecting the farmers into the PIK Program based upon bid rankings and PIK sugar available, the FSA was charged with gathering the eligibility information and assisting the farmers in submitting Form CCC-744.  Essentially, then, the CCC set a cut-off, or maximum, bid value and accepted bids after the local FSA had determined whether the farmers were eligible.  *See* SU-70, § 12B.

Once a bid was accepted, the local FSA would designate those parcels on which crops would be destroyed.  *See* SU-70, § 12.B.  If the FSA determined that a proposed parcel would be designated for crop destruction, the beets on that parcel were plowed under.  The CCC then made "In-Kind Payments" from its storage surplus of either refined beet sugar or raw cane sugar.

In the present case, local FSA officials assisted the farmers in filling out the

paperwork, and counseled them as to which fields were eligible for the PIK program.  *See, e.g.,* Clinger AR at 260-62.  Each of the seven farmers completed and submitted Form CCC-744 in September, 2001.  The CCC accepted their bids, and gave the farmers a deadline for designating which fields would be subject to crop destruction.

To meet the deadline, the farmers worked with local FSA agents who helped them select eligible fields.  In some instances, the local FSA agents went out and walked the field boundaries with the farmers, using GPS devices to obtain accurate coordinates of the fields.  For each of the farmers, the local FSA agents assisted them in designating fields for crop destruction.

Relying on these official approvals, the farmers then plowed under their designated sugar beet crops in late October or early November of 2001.  The CCC supplied the sugar to the producer, and the farmers all received their PIK payments by the end of 2001.

More than ninety days later, the national FSA audited the program.  Notice SU-70 gives authority to the FSA's Deputy Administrator of Farm Programs (DAFP) to review PIK contracts.  *See* § 7.C.  In this case, the DAFP decided that two of the farmers (Clinger and Thompson) were not "producers" and that the five others (Bean, Toner, Wrigley, Inouye, and Funk) were not "at risk."  He therefore

declared them all ineligible and demanded repayment.

The DAFP decision was reviewed by a Hearing Officer (HO) who heard testimony, evaluated evidence, determined credibility, and made a decision regarding eligibility. The HO, hearing each case separately, determined that four of the farmers were eligible, and that three were not. The FSA appealed the four cases where the HO found that the farmers were eligible to the NAD Director. The NAD Director found these four farmers ineligible on review.

Accordingly, the FSA sent demands to all seven farmers for repayment of the 2001 PIK monies. The FSA also requested interest and liquidated damages under term 14.E in Form CCC-744.

The farmers responded by filing this suit seeking to block the FSA's demand for payment. The Court will turn to an analysis of the cross-motions for summary judgment.

## ANALYSIS

### 1.    <u>Finality Rule</u>

Under the Finality Rule, a determination of a local FSA office becomes final after 90 days from the date the application was filed, unless (1) a participant requests administrative review of the determination, (2) the determination was based upon misrepresentation, false statement, fraud, or willful misconduct, (3) the

determination was modified by the agency, or (4) the participant had reason to know that the determination was erroneous. 7 U.S.C. § 7001(a)(2).  Once that determination of the local FSA office becomes final, "no action may be taken by the [FSA], the [CCC], or a [local FSA office] to recover amounts found to have been disbursed as a result of a decision in error unless the participant had reason to believe that the decision was erroneous."  7 U.S.C. § 7001(a)(3).

The policy behind this rule is apparent.  An agricultural subsidy program, especially one like the 2001 PIK Program that is announced weeks before harvest, is time-sensitive.  A farmer prepares the entire year for a harvest period of a few weeks.  Subsidy programs like the 2001 PIK Program create an incentive for farmers to destroy their crops; the farmers save the cost and labor of harvest and still get paid.

Once a farmer invests time and resources to harvest a field, there is no incentive to destroy a crop.  Conversely, there is no incentive to make an irrevocable offer and watch a crop rot in the ground waiting for an eligibility determination or to prematurely destroy a crop and hope for acceptance. Therefore, if the FSA or CCC wants the benefit of controlling market prices or ridding itself of surplus sugar, then it has to be decisive and farmers have to be able to rely on what the agency tells them.

**Memorandum Decision – Page 7**

In this case, the FSA does not claim that any of the Rule's exceptions apply or that the farmers had reason to believe that the local FSA office erroneously determined that they were eligible.[1]  Rather, the FSA claims that the CCC made the final decision to accept bids, and that local FSA offices had no  authority to make any final eligibility determinations.

While the FSA's interpretation is entitled to deference, it is not supported by its own pronouncements.  Notice SU-70 states that the local FSA offices "shall . . . determine land and producer eligibility according to paragraph 4 [containing the eligibility criteria]."  *See* § 12B.  This language does not narrowly confer authority on local FSA offices only to make eligibility "recommendations" or "suggestions" to the CCC.  Instead, the wording proclaims that local FSA offices "shall determine" eligibility – words too forceful to be bent to the Government's interpretation.

And the word "determine" was not casually selected by the USDA – it is a

---

[1]  During the administrative hearing process, various rulings were made concerning the Finality Rule, all concluding that it did not apply.  For example, one ruling reasoned that the Rule only applies to adverse decisions.  That decision is obviously wrong because the Rule makes final favorable decisions.  Government counsel recognized the analytical weakness of these administrative rulings, and argued only that their conclusions were correct "even if the reasons given for those decisions were not correct."  *See* Government Response Brief at p. 5.  The Court interprets this as an abandonment of the reasons given in the administrative rulings for not applying the Finality Rule, although not an abandonment of the ultimate conclusion that the Finality Rule is inapplicable.  The Court will therefore confine its analysis to the reasons advanced by the Government in its briefing, and will not address further the reasons proffered by the administrative rulings.

**Memorandum Decision – Page 8**

word of art, a verb whose noun form ("determination") is defined in the USDA regulations as "a decision issued by [a local FSA office] that affects a participant's status in a program administered by FSA."  *See* 7 C.F.R. § 718.2.  This definition becomes crucial because the regulations confer Finality Rule protection on "[a] determination" made by a local FSA office.  *See* 7 C.F.R. § 718.306(a).  The land and producer eligibility decisions made here by the local FSA offices clearly fall within the definition of a "determination" that qualifies for Finality Rule protection.

The local FSA offices obviously believed they had the authority to make eligibility determinations because they did so for each of the farmers in this case. In the case of the Toners and Thompsons, the local FSA offices went even further and held hearings to determine if these farmers were eligible before sending those bids to the CCC for acceptance.  Toner AR 252-256, 167; Thompson AR 137.  The DAFP demanded repayment based upon the eligibility requirements that the local FSA office was responsible to determine.

The Court therefore finds the FSA's interpretation unreasonable and contrary to its own governing statute and regulations.  The Finality Rule applies here and prohibits the FSA from recovering the payments made to the farmers under the 2001 PIK program.

**Memorandum Decision – Page 9**

2.    **Estoppel**

Equitable estoppel may be imposed as a defense by a party who, ignorant of certain facts, relies to his injury on the conduct of another who knows those facts and intends that his conduct be relied upon by the injured party. *Jablon v. U.S.*, 657 F.2d 1064, 1067 (9th Cir. 1981).  Additional elements are required to be shown when estoppel is asserted against the Government.

First, estoppel cannot be used affirmatively against the Government to pursue a claim for monetary relief. *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990).  Here, the farmers use estoppel defensively to resist a claim of the Government, not offensively to collect damages.

Second, the Government must have committed "affirmative misconduct going beyond mere negligence." *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir. 1985).  This requirement is not satisfied by proof of a "mere failure to inform or assist." *Wagner v. Director, FEMA*, 847 F.2d 515, 519 (9th Cir. 1988).  Instead, it requires a showing of "affirmative" misconduct, which could include a "deliberate lie or a pattern of false promises," *Socop-Gonzalez v INS*, 272 F.3d 1176, 1184 (9th Cir. 2001) (en banc).  While there is no requirement that the Government intend to mislead a party, *Jablon*, 657 F.2d at 1067, n. 5, "[p]ersons dealing with the government are charged with knowing government statutes and regulations,

**Memorandum Decision – Page 10**

and they assume the risk that government agents may exceed their authority and provide misinformation." *Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir. 1986). Ultimately, the existence of "affirmative misconduct" must be decided on the facts of each case because there is no single test that applies in every instance. *Watkins v. United States Army*, 875 F.2d 699, 707 (9th Cir. 1989) (en banc).

Even where affirmative misconduct has been proved, "estoppel will only apply where the Government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Morgan*, 779 F.2d at 545. Finally, the Government cannot be estopped by the unauthorized acts of its agents. *Saulque v. United States*, 663 F.2d 968, 976 (9th Cir. 1981).

To satisfy these legal standards, the farmers in this case must prove each of the following: (1) the traditional estoppel elements; (2) affirmative misconduct on the part of the Government; (3) a serious injustice; (4) that the public's interest will not suffer undue damage by imposition of the liability; and (5) authorization for the acts on which estoppel is based.

All of these requirements were found to be satisfied in *United States v. Lazy FC Ranch*, 481 F.2d 985, 988 (9th Cir. 1973). There, ranchers operating a partnership known as the Lazy FC Ranch inquired about a USDA subsidy program

that would allow them to be paid for taking land out of production.  The local USDA agent, Marlin Lind, originally declared them ineligible, but later devised a plan to reconfigure the partnership so that it would qualify.  With "help" from Lind, the ranchers complied with his plan, were accepted into the program, and entered into contracts with the USDA to take their land out of production.  *Id.* at 986.

Lind's reconfiguration plan was "arguably" supported by the USDA regulations in effect at that time.  *Id*. at 990.  Moreover, the ranchers would never have applied for the program but for Lind's assurance that his reconfiguration plan was proper under the USDA regulations.  *Id.* at 989.

After Lind's approval, the USDA changed the regulations so that the ranchers no longer qualified for the program.  Recognizing their ineligibility, the ranchers petitioned the USDA to terminate their contracts.  *Id.* at 986-87.  Nevertheless, the USDA continued to pay the ranchers under the contracts.  *Id*.

Sometime later, the USDA demanded that the ranchers return the payments made under the contracts.  When the ranchers refused, the USDA brought suit in the U.S. District Court for the District of Idaho seeking repayment.

District Judge Fred M. Taylor held that the USDA was estopped from demanding payment.  The Circuit affirmed that result, although it used a different

line of analysis than that employed by Judge Taylor.  The Circuit found that a serious injustice would be done if estoppel was not applied, and that the public interest would not be unduly impaired by allowing the ranchers to keep their payments because "the partners lost at least as much profit from not farming as they received in government payments."  *Id*. at 989-90.

The Circuit appears to have assumed, without discussion, that the traditional elements of estoppel were present.  It also found that the contracts were "arguably" authorized by the regulations in effect at the time of the signing.  *Id*. at 990.

While not using the term "affirmative misconduct," the Circuit found its equivalent because (1) but for Lind's assurances, the ranchers would not have reconfigured their partnership and applied for the program, and (2) after the ranchers took their land out of production – giving the USDA the benefits it sought – the USDA changed the regulations, rendering the ranchers ineligible, but then refused the ranchers' request to terminate its contracts.  *Id*. at 989-90.

There are many similarities between *Lazy FC* and this case.  For example, in both cases the USDA did not pursue any claims that the farmers/ranchers made false statements or were dishonest in any way in revealing the details of their

operations and answering other eligibility questions.[2]

In both cases, Government officials did much more than stand by and offer negligent advice – they actively participated in the qualification process. In *Lazy FC*, USDA official Lind devised the reconfiguration plan and persuaded the ranchers to follow it. Here, local FSA officials walked the field boundaries with the farmers and counseled them on which parcels they should identify for crop destruction.

This affirmative conduct was later used in both cases by the USDA as part of its justification for finding the participants ineligible, a wholly unfair result. For example, in the present case, the Clingers had three sugar beet fields, two owned by Clingers, Inc, and one owned individually. Local FSA officials were actively involved in selecting the field owned by Clingers, Inc., rather than the field owned individually, for crop destruction. Later, the USDA found the Clingers ineligible because the designated field was owned by the corporation.

This Government conduct is similar to that found in *Lazy FC* where Lind devised the reconfiguration plan that was ultimately used by the USDA to justify its decision that the ranchers were ineligible. The teaching of *Lazy FC* is that such

---

[2] In *Lazy FC*, the USDA originally asserted that the ranchers made false claims, but later dropped those claims and sought only the "recovery of money erroneously paid." *Id*. at 986.

**Memorandum Decision – Page 14**

conduct exposes the Government to estoppel.  The same result should follow here.

Neither case falls within the large category of cases where estoppel is inapplicable

because the Government agent merely gave negligent advice about the meaning of

a regulation.

In both cases, the determinations made by Government agents were at least

arguably permissible under then-existing regulations and rules.  Thus, neither case

falls within the large category of cases where farmers/ranchers violated their duty

to be aware of regulations and rules clearly contrary to the advice of local agents.

*See Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947) (refusing to

apply estoppel against the Government because farmers had constructive notice

that agency regulations were directly contrary to misrepresentations of

Government agents).

In both cases, the Government made official determinations that the

farmers/ranchers qualified for the programs.  Thus, neither case falls into the large

category of cases where farmers relied on vague pronouncements or qualified

endorsements.

The farmers/ranchers relied on these official determinations to their

detriment by leaving ground fallow or destroying crops.  They thereby satisfied

their obligations and conferred on the Government all of the benefits it sought –

**Memorandum Decision – Page 15**

land was rested in *Lazy FC* and surplus sugar was drawn down in this case.
Nevertheless the Government seeks the return of the *quid pro quo* it paid to obtain
those benefits.

In *Lazy FC*, the USDA refused to grant the ranchers' request to terminate
their contracts after the new regulations made them ineligible, essentially locking
the farmers into an improper arrangement.  Much the same thing happened in this
case.

Here, the local FSA offices assisted the farmers in preparing their bids,
determined that the farmers were eligible, and notified them accordingly.  On the
basis of these assurances, the farmers made their bids, which were irrevocable.  At
that point, the farmers became locked into an improper arrangement – at least in
the later opinion of the national FSA – just as the ranchers were in *Lazy FC*.

Moreover, the USDA rushed this program into place in violation of the
APA's notice and comment rules.  *Sugar Cane,* 289 F.3d at 89 (finding that the
USDA violated the APA in promulgating the 2001 PIK program).  And it got
sloppy – while not intending that local FSA offices would make final decisions on
land and producer eligibility (judging from its briefs in this case), the USDA
nevertheless did precisely that in SU-70.  *See* SU-70 at ¶ 12B.

The farmers were understandably lured in by this official conferral of

authority and the consequent eligibility approvals issued by local FSA offices.
This conduct, along with all the circumstances discussed above, puts this case
squarely within the *Lazy FC* line of precedent justifying a finding that the USDA
committed "affirmative misconduct going beyond mere negligence." *Morgan*, 779
F.2d at 545.

## 3.   Serious Injustice & Public Interest

The Court must next determine whether the Government's affirmative
misconduct threatens to work a serious injustice, and whether the public's interest
will be unduly damaged by imposing estoppel. *Johnson v. Williford*, 682 F.2d 868,
871 (9th Cir. 1982). The public interest in recovering the subsidy was much
stronger in *Lazy FC* – where estoppel was applied – than in this case. There, the
improper payments exceeded the maximum payment amounts under the
regulations and continued for several years. Here, the subsidy payments did not
exceed the $20,000 maximum, *see* 66 FR 47447, and the farmers only received
payments-in-kind for a single harvest.

Moreover, the farmers here received their subsidies only after destroying a
crop that was ready for harvest. That destruction was precisely in line with the
public interest. *See Sugar Growers*, 289 F.3d at 89 (noting that expensive storage
costs incurred by the USDA would be reduced by the program). To now allow the

**Memorandum Decision – Page 17**

FSA to recoup its subsidies after reaping the benefit of the surplus draw-down and the crop destruction would work a serious injustice, and would not be in the public interest.

To this point in the decision, the Court has found that (1) the FSA has committed affirmative misconduct going beyond the giving of negligent advice, (2) a serious injustice would be perpetrated by denying the application of equitable estoppel, (3) the public interest will not suffer undue damage by refusing the Government's attempt to recoup the subsidies, and (4) the acts on which estoppel was based were authorized.  The Court now turns to the other four traditional requirements of equitable estoppel.

### 4.    <u>Traditional Elements of Estoppel</u>

There are four traditional elements of estoppel:  (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.  *United States v. Wharton*, 514 F.2d 406, 412 (9th Cir.1975).

Turning to the first requirement, the issue is whether local FSA agents knew the facts – that is, whether those agents knew the facts concerning the farmers' eligibility.  As outlined in the fact section, the local FSA knew the farmers

**Memorandum Decision – Page 18**

personally.  The local FSA knew that the farmers were signors to a contract with a

sugar processor.  The local FSA helped the farmers determine historic field

production and yield for purposes of the Program.  The local FSA was familiar

with the farmers' various business structures and formations.  In at least two

instances, the local FSA held hearings to clarify its understanding of these

structures and organizations.  The local FSA knew which fields were proposed for

the program and helped the farmers map these fields for destruction.

The local FSA also knew what its responsibilities in the Program were, and

how the program was intended to be carried out.  The local FSA knew that its job,

*inter alia*, was to determine land and producer eligibility based upon SU-70

Sections 7 and 4.  In addition to Notice SU-70, it also had instructions in Form

CCC-744 and the Appendix.  The FSA knew the facts.

The second requirement asks whether the FSA acted in a manner that gave

the farmers a right to believe that the FSA intended for farmers to act in reliance on

the FSA's conduct.  The FSA intended that the local FSA carry out the Program in

the field.  The local FSA helped farmers complete Form CCC-744.  This contract

created an irrevocable offer to participate in the 2001 PIK Program.  The Program

was time sensitive, and once the farmers received notice that they were accepted

they had 10 days to pick a field to destroy.  Again, the local FSA consulted with

the farmers to determine which fields should be plowed under for purposes of the

Program.  The farmers then received in-kind payments based upon the local FSA's

determinations.  These facts clearly satisfy the second requirement.

The third requirement asks whether the farmers were ignorant of the true

facts.  The farmers believed they were eligible, and the FSA agreed, at least until

the FSA's interpretations and definitions changed after the contracts were signed

and submitted.  This requirement is satisfied.

The final requirement is that the farmers must have relied to their injury on

the FSA's conduct concerning eligibility.  The injuries resulting from the farmers'

reliance are undisputed.  The farmers plowed under their fields that were ready to

be harvested.  The farmers also paid penalties to the sugar processor for the

difference between the CCC's in-kind payment and amount they had contracted to

deliver.  This requirement is met.

The Court therefore finds that the farmers have satisfied all the requirements

for applying equitable estoppel against the FSA.

**5.     Conclusion**

The Court shall apply both the Finality Rule and the doctrine of equitable

estoppel to prohibit the FSA from recovering payments made to these farmers

under the 2001 PIK program.  Accordingly, the Court will grant the motion for

summary judgment (Docket No. 31) filed by the farmers and deny the motion filed

by the Government.  (Docket No. 32)The Court will enter a separate Judgment as

required by Rule 59(a)(1).

DATED:  **March 8, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court